## COMMERFORD *v.* THOMPSON.

*(Circuit Court, D. Kentucky.* March 31, 1880.)

LETTERS CONCERNING LOTTERIES—LETTERS ADDRESSED TO SECRETARY OF LOTTERY COMPANY—DETENTION BY POSTMISTRESS—INJUNCTION.— A court of equity will not grant relief where letters addressed to the secretary of a lottery company are detained by the postmistress, under the direction of the postmaster general, as having been mailed in violation of section 3894 of the Revised Statutes, providing that "no letter * * * concerning lotteries * * * * * shall be carried in the mail," where the pleadings fail to show that the letters had no connection with the lottery business.

In Equity.

*James A. Beattie, D. W. Sanders* and *W. O. Dodd,* for complainant.

*G. C. Wharton, J. R. Goodloe* and *A. A. Freeman* for defendant.

BROWN, J. This is a bill brought by the complainant, a citizen of New York, against the defendant, postmistress of the city of Louisville, for the purpose of enjoining her from interfering with and delaying complainant's letters, addressed to him at Louisville. The bill charges, upon information and belief, that there are in the post-offices, and have been since the tenth of October, letters of the value of $5,500, addressed to "T. J. Commerford, Secretary, Louisville, Kentucky, lock-box No. 121," with the required postage prepaid upon each letter, and that defendant has taken possession of the same, and refuses to deliver them as the laws of the United States require, notwithstanding he has demanded possession thereof. The bill further alleges that at the time these letters were mailed the postal laws of the United States and the regulations of the department authorized the mailing and transmission thereof and their delivery by the defendant; that the complainant is entitled to possession of the same, and unless they are delivered he will suffer great wrong and irreparable injury.

Prayer for an injunction to the defendant to deliver posses-

v.1,no.7—27

sion of any and all letters addressed to the complainant, as well as all such as may hereafter be addressed to him and received at her office.

In her answer defendant bases her refusal upon certain instructions from the postmaster general, directing the detention of letters addresssed to the complainant. She denies that the laws of the United States, or the regulations of the department, require the delivery of such letters, and charges, upon information and belief, that all of said letters are letters and communications about and concerning a lottery known as "The Commonwealth Distribution Company;" that all of said letters are intended to be received by said company, although addressed in the name of the complainant, "Secretary," for convenience, and to conceal the fact that they were intended for said company, and that they were letters and communications concerning a lottery; that they are the exclusive property of said company, and that the complainant is but the secretary so-called, and employe of said company, and has no ownership or property in said letters; and that said letters, and every one of them, were deposited in the mail bag of the United States in violation of the laws of said government, and that their transmission from the various offices where they were deposited was also in violation of the law.

The answer further sets forth the correspondence with the postmaster general in which he directed defendant to detain letters to "T. J. Commerford, Secretary," and insists such order was justified by law, and was within the scope of his powers as postmaster general.

Few intelligent persons will deny that lottery gambling is a vice which merits the reprobation visited upon it by almost all the enlightened legislatures of modern times. The moral sense of the community long since pronounced against it, and the eloquent denunciations of Mr. Justice Catron, in the case of *The State* v. *Smith*, 2 Yerg. 272, will touch a responsive chord in the heart of every honest man.

The recent report of the postmaster general to the house of representatives sets forth with startling emphasis the

systematic deception and often deliberate swindling practiced by the promoters of these and kindred enterprises, and his efforts to purge his department of all complicity in their doings challenges the approval of public opinion.

At the same time courts are bound to administer the law as they find it, and are often powerless to remedy evils, the existence of which is fully admitted. The toleration or inhibition of lotteries is a matter exclusively within the control of the several states, and congress can do no more than to deny them the use of the national mails for the propagation of their schemes.

But while there is, undoubtedly, power to prescribe what shall or what shall not be carried by post, (*ex parte Jackson,* 96 U. S. 727–732,) the mails are, *prima facie,* intended for the service of every person desiring to use them; and a monopoly of this species of commerce is secured to the post-office department. Rev. St. § 3982. It is, then, scarcely necessary to say that the officers of the department are the agents of the public in the performance of this service, and that no postmaster, whether acting under the instructions of the postmaster general or not, can lawfully refuse to deliver letters addressed to his office, unless special authority for so doing is found in some act of congress. Indeed, the unlawful detention of letters by a postmaster is denounced by sections 3890 and 3891, and a violation of his duty to deliver mail matter is made punishable by fine and imprisonment.

Authority for the detention of the complainant's letters by the defendant in this case is claimed to exist under the following section of the Revised Statutes:

"Section 3894. No letter or circular concerning lotteries, so-called gift concerts, or other similar enterprises offering prizes, or concerning schemes devised and intended to deceive and defraud the public for the purpose of obtaining money under false pretences, shall be carried in the mail. Any person who shall knowingly deposit or send anything to be conveyed by mail in violation of this section shall be punishable by a fine of not more than $500, nor less than $100, with costs of prosecution."

Counsel for the government have based their whole defence upon the applicability of this section to the case under consideration. Whether it was intended to apply only to mail matter posted in the interest of lottery companies, gift concerts and other similar enterprises, by their managers or agents, for the purpose of attracting custom, or equally to letters addressed to such companies, is the main question in this case. Its solution depends largely upon the construction to be put upon the word "concerning." It is obvious that this word was not intended to be used in its broadest sense, "pertaining to or relative to," as such construction would include every letter of which the enterprises mentioned in the section were wholly or in part the subject, comprising not only letters written in the interest of these enterprises, but letters of inquiry, letters seeking legal advice, letters written for the purpose of suppressing their business, and even the correspondence carried on between the defendant and the general post-office in this case. This certainly was not the intention of congress.

The word "circular," we think, affords a clew to the meaning of this section. This word obviously refers to circulars sent out by lottery companies for the purpose of advertising their schemes, and the word "letter" used in connection with it, under the rule of "*ejusdem generis,*" imports letters of a similar character and mailed for a like purpose.

It was evidently the intention of congress to strike at the root of the lottery system by inhibiting to them the use of the mails for the propagation of their schemes, and to fix a penalty for such use; but the imposition of such penalty upon the writers of letters addressed to the promoters of the enterprises mentioned in this section might result in great injustice, as many of these men purport to be engaged in a perfectly legitimate business, "not depending upon chance, but upon accumulated capital, invested, under the advice of men of experience, judgment and integrity, in the actual purchase of stocks in Wall street," and the letters might be written by persons wholly ignorant of the true nature of the enterprise, and with a perfectly innocent intent. The act is not only in

derogation of the common law, but is penal in its character, and should therefore receive a strict construction.

This section was evidently intended for the punishment of the guilty promoters of these impostures, but in other sections congress has provided, not for the punishment, but for the protection of their victims, by requiring registered letters and money orders to be returned to the writers under such regulations as the postmaster general may prescribe. Sections 3929 and 4041. No penalty is in express terms affixed to the senders of these letters, and we think it would be a forced construction of the law to apply the penalties of section 3894 to them. Obviously, sections 3929 and 4041 will not justify the acts of the defendant in this case, as the Commonwealth Distribution Company is not fraudulent, but is apparently legalized by the law of the state, (at least this was assumed upon the argument,) and there is no averment in the answer that the letters are registered or contain money orders. Nor is there any allegation of a compliance by the defendant with the regulations of these sections; indeed, it was admitted upon the argument that the act of the defendant could not be justified unless section 3894 covered the case.

But we think the act of the defendant in detaining these letters was unauthorized for another reason. The act declares certain letters unmailable, but provides no machinery for their arrest and detention, probably because no such machinery is possible, except by resort to the courts, without a violation of the constitutional guarantee of the right of the people to be secure in their papers against unreasonable searches and seizures. *Ex parte Jackson,* 97 U. S. 733. The act simply provides for the imposition of a fine upon the person mailing them. We think this method of enforcing the statute is exclusive, at least of any such remedy as the detention of letters on a mere suspicion, though I would not say that a postmaster might not lawfully refuse to receive letters *known* to him, by the statements of those mailing letters, or otherwise, to contain unmailable matter.

It is a rule in the construction of statutes that where a new offence is created, and the penalty is prescribed for it, or a

new right is given and a specific relief provided for the violation of such right, the punishment or remedy is confined to that given by the statute. Sedgwick on Statutory Law, 94. In this construction I concur in the opinion of Mr. Attorney General Devens, of April 30, 1878; but conceding that the act of the defendant in detaining these letters was unauthorized, and that the complainant might maintain an action at law for damages, it does not necessarily follow that he is entitled to an injunction. The writ of injunction does not issue as a matter of course, even if the complainant has made out a technical right to relief. An application to the court of chancery for the exercise of its prohibiting powers or restrictive energies must come by the dictates of conscience, and be sanctioned by the clearest principles of justice. The granting of an application is largely a matter of discretion, and is addressed to the conscience of the chancellor, acting in view of all the circumstances connected with the case. A party seeking this extraordinary remedy must come into court with clean hands, and show not only that his claim is valid by a strict letter of the law, but that in justice and equity he is entitled to this particular mode of relief.

In the case of the *Maryland Savings Institution* v. *Schroder*, 8 Gill & Johnson, 93, the depositor of a sum weekly in a savings institution, which he was entitled to withdraw at pleasure, agreed with and requested the institution to convert and invest his deposits permanently into the stock of said company. Upon the conversion he received dividends and participated in its entire profits. The institution became insolvent, and receiving in the course of its settlement with its debtors its certificates of deposit and payment, which would absorb all available funds of the depositor, on the ground that a conversion of his money into stock was in violation of the charter of the company, he applied for an injunction. It was held that whether the charter authorized it or not he was not entitled to the restraining power of the court. In delivering the opinion the court observed:

"The object of the injunction appears to have been, and its effect and operations are to prevent the officers of the cor-

poration from paying the special depositors, on receiving their certificates of deposit, in the payments of debts due to the institution. How far it is warranted by the principles of equity and conscience in such, its operation upon their right and interests, it is the duty of this court now to examine and declare, and we think that in a court of conscience, at least, but little doubt can be entertained upon the subject. It is an unyielding and inflexible principle of the court of chancery that he who seeks equity ought to be prepared to do equity. Before, therefore, the complainant can enlist the countenance of a court of equity in his favor, he must be prepared to render to these depositors that full measure of justice which the principles of equity and conscience demand at his hands."

It was said in *Bosley* v. *Johnson* (7 Harris & Johnson, 468) "that there was no case in which a court of equity ever granted a perpetual injunction to a complainant to protect him in the enjoyment of a naked legal right which he or those under whom he claims have stipulated by deed not to exercise."

Legal rights are to be asserted by legal means, and in such cases courts of equity never lend their aid where justice and equity do not imperatively demand it.

In *Kneedler* v. *Lane*, 3 Grant's Cases, 523, an injunction had been issued against the officers of enrolling boards to restrain them from proceeding further with the drafting of soldiers under the conscription act of March 3, 1863, upon the ground that the act was unconstitutional. In a subsequent argument of the case the decision was overruled and the act pronounced constitutional, but it was further held that, even if the act had been unconstitutional, the court ought not to have granted an injunction.

In delivering the opinion Mr. Justice Strong observed: "I had no doubt then, and I have none now, that these bills do not present a proper case for the interference of a court of equity by an injunction, even if the act of congress were unconstitutional. The facts charged exhibit no case for the intervention of a court of equity. No chancellor ever enjoined

in such a case, and I think it has never before been supposed that he has any jurisdiction over such wrongs, if it be a wrong, as these complainants ask to be restrained. No one has ventured to assert that every civil wrong may be restrained by injunction, and that a judge sitting in equity can enjoin against any act that a common-law court and jury can redress."

In *Edwards* v. *The Allouez Mining Co.* 38 Mich. 46, an injunction to restrain a corporation from encroaching upon the land of a riparian proprietor, and polluting the stream in front, was denied upon the ground that he had bought the land upon speculation, knowing of the encroachments, and had tried to sell it to the corporation at an exhorbitant price. The comments of Mr. Justice Cooley are pertinent in this connection: "Wherever one keeps within the limits of lawful action, he is certainly entitled to the protection of the law, whether his motives are commendable or not; but if he demands more than the strict rules of law can give him, his motives may become important. In general, it must be assumed that the rules of the common law will give adequate redress for any injury; and when the litigant avers that under the circumstances of his particular case they do not, and that, therefore, the gracious ear of equity should incline to hear his complaint, it may not be amiss to inquire how he came to be placed in such circumstances." See, also, Kerr on Injunctions, 6; 2 Storys' Equity, § 959; *Tucker* v. *Carpenter*, Hemps. 440; *Cassaday* v. *Cavenor*, 37, Iowa, 300; *Jones* v. *City of Newark*, 3 Stock. 452; *Cobb* v. *Smith*, 16 Wis. 661; *Bonaparte* v. *Camden & Amboy R. Co.* Bald. 218.

Let us apply these principles to the case under consideration. The answer avers, and for the purposes of this case it must be taken as true, that all said letters are letters and communications about and concerning a lottery known as the Commonwealth Distribution Company, and that all said letters are intended to be received by said company, and are its exclusive property. The word "concerning," as used in this answer, must be taken in the sense in which it was intended by the pleader, as meaning that the letters detained belonged

to the distribution company, and related to the business carried on by that company. It is fair to presume that this company is seeking them in furtherance of its business as a lottery; indeed, in the bill, they are expressly averred to be at the value of over $5,000, and in complainant's brief they are said to contain orders for tickets. Now, congress has placed upon all of this class of enterprises the stamp of its disapproval. It has denounced it by legislation, as far-reaching as its constitutional power permitted, as contrary to public policy. We think that a court of equity ought not to lend its aid directly or indirectly to schemes which congress has thus characterized.

Suppose the defendant had detained letters and circulars mailed by this company, and the complainant had filed the bill, confessing the character of the letters, to enjoin her action upon the ground that the section only imposed a penalty, and did not in terms authorize the detention of letters, we think a court of equity would not hesitate to refuse its aid thus sought for an unlawful purpose. The case under consideration is but one remove from this. In all human probability the letters detained here are written, not only in furtherance of the lottery business, (*Dwight* v. *Brewster*, 1 Pick. 50,) but are to be answered, and in answering them complainant will be guilty of a violation of the law. Had he replied to the answer, and made it appear that the letters had no connection with the lottery business, he might have been entitled to the protection of a court of equity, but the pleadings fail to show a moral obligation on the part of this court to relieve him. In any light in which this case can be viewed, it is impossible to avoid the conclusion that the court is required to lend its aid to a scheme condemned alike by congress and by public opinion. Complainant should be left to his remedy at law.

An order will therefore be entered dismissing the bill.